UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RAYMOND SCOTT, )
)
    Petitioner, )
)
vs. ) Case No. 4:04-CV-750 (CEJ)
)
LARRY ROWLEY, )
)
    Respondent. )

**MEMORANDUM**

This matter is before the Court on the petition of Raymond Scott for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.    Procedural Background**

On December 4, 1998, a jury in the Circuit Court of Wright County, Missouri, convicted petitioner Raymond Scott of one count of second-degree murder. On February 16, 1999, the trial court sentenced petitioner to a term of twenty-seven years imprisonment.

The Missouri Court of Appeals affirmed petitioner's conviction and sentence in an unpublished opinion issued on May 15, 2000. State v. Scott, No. 22855 (Mo. Ct. App. May 15, 2000) (Resp. Ex. E). On August 23, 2000, petitioner filed a motion for post-conviction relief under Missouri Supreme Court Rule 29.15. On June 17, 2002, following an evidentiary hearing, the post-conviction court denied petitioner's motion. On May 12, 2003, the Missouri Court of Appeals summarily affirmed the denial of post-conviction relief. Scott v. State, No. 25071 (Mo. Ct. App. 2006) (Resp. Ex. J).

Petitioner filed his § 2254 petition with this Court on June 17, 2004,[1] asserting the following claims for relief: (1) the trial court erred in denying petitioner's motion to sanction the State for its failure to timely disclose an inculpatory statement; (2) the trial court erred in denying petitioner's request for a continuance; (3) the trial court erred in denying defense counsel's motion to withdraw due to a conflict of interest; (4) the trial court erred in denying a defense request for a mistrial; (5) the trial court erred in denying petitioner's motion to suppress his statement to police; (6) the trial court erred in denying petitioner's motions for judgment of acquittal because there is insufficient evidence to establish guilt beyond a reasonable doubt; (7) the trial court improperly submitted a jury instruction that varied from the charged offense; (8) trial counsel failed to timely move to withdraw after realizing he had a conflict of interest; (9) trial counsel failed to object to prejudicial questions during *voir dire*; and (10) trial counsel failed to object to admission of an unredacted videotape of petitioner's statement.

For the reasons set forth below, the Court concludes that petitioner has failed to establish that the decisions of the state court were contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in State court proceedings. 28 U.S.C. § 2254(d).

II. **Background**

---

[1] The Court dismissed the petition as time-barred on July 25, 2007. The Eighth Circuit Court of Appeals initially denied petitioner's application for a certificate of appealability. Following the issuance of its opinion in Riddle v. Kemna, 523 F.3d 850 (8th Cir. 2008), the Eighth Circuit granted his petition for rehearing and remanded the matter for this Court to determine whether the circumstances of the case justified equitable tolling of the statute of limitations. On April 23, 2009, the Court determined that petitioner was entitled to equitable tolling and directed the respondent to file a response to the merits of petitioner's claims.

Petitioner's conviction arises from the death of his three-year-old stepson Devin Bonilla, on Sunday, October 26, 1997. The cause of death was acute peritonitis resulting from a tear in the small intestine caused by blunt-force trauma.

At the time of his death, Devin resided with his mother, Cheryl Scott; his step-father, petitioner; and his infant half-sister, Allison. Holly Bonilla, Cheryl Scott's sister-in-law, testified that she stayed overnight with the Scott family on October 25th. (Tr. 583). According to Ms. Bonilla, Devin ate dinner along with everyone else on Saturday night. (Tr. 584). On Sunday morning, Devin "got in trouble" at breakfast by throwing out some of his food. His mother told him to go see petitioner, who was still in bed. (Tr. 586). Ms. Bonilla testified that she heard Devin crying as he entered the bedroom; she did not hear any sounds coming from the bedroom. (Tr. 589). Devin emerged and seemed "sad" to Ms. Bonilla. (Tr. 592). As the women prepared to leave the house for the day, Devin asked his mother to let him go to Ms. Bonilla's home for the day. He was told he had to remain at home with petitioner. He began to cry and Ms. Scott again sent him to the bedroom to see petitioner to be punished. Id. The women left the home; petitioner remained there with Devin and Allison.

Denise Bonilla, Cheryl's mother, testified that she called the Scott residence at 1:00 on October 26th. (Tr. 832). She spoke to petitioner, who stated that Devin had vomited earlier in the day but seemed better after having some crackers and soda. (Tr. 834). Lori Smally, an employee with an ambulance company, testified that she received a call to the Scott home at about 5:00 that afternoon. (Tr. 602-02). She testified that when the response team arrived, they found Devin lying on his left side on the living room floor, not breathing and without a pulse. She testified that his color was "really blue . . . around his lips [and] his fingers." (Tr. 604). His abdomen was "very extended and hard," and abnormally "bulged out." (Tr. 605). Devin could not

be revived. (Tr. 606). Ms. Smally testified that petitioner told the responders that Devin had vomited throughout the day and had been very thirsty. (Tr. 608-09). Ms. Smally observed bruising around Devin's navel and on his forehead. She testified that petitioner stated that Devin bruised his head when he ran into the stereo speaker. (Tr. 609-10).

Douglas Anderson, M.D., performed the autopsy. He noted a total of 14 to 15 separate areas of bruising on Devin's face, right forearm, right side, clavicle, rib cage, and around his navel. (Tr. 684). Upon examination, Dr. Anderson determined that the child's bowel was ruptured; there was no damage to the liver or spleen, indicating that the damage to the bowel was the result of a focused blow of significant force,[2] rather than a more generalized trauma to the abdominal area, such as that caused by a seatbelt. (Tr. 655-60). Devin's death was ruled a homicide. (Tr. 660). Dr. Anderson testified on direct examination that it was possible that the injury to the intestine could be sustained between 8:00 and 11:00 in the morning and cause death by 4:30 or 5:00 in the afternoon.[3] Id. Immediate treatment following the injury "quite probabl[y]" would have prevented the child's death. (Tr. 661).

Petitioner gave numerous statements regarding Devin's injuries. On October 28, 1997, petitioner told investigators in a videotaped statement that Devin had been sick throughout the day. (Tr. 719, 725-36). At one point, petitioner thought Devin was choking and tried the Heimlich maneuver. He then ran to his brother's home for help and returned. Devin was not breathing. While petitioner's brother called 911,

---

[2]Dr. Anderson likened the force required to cause the injury to that occurring in a fall from a height of at least a story, or a traffic accident at speeds of 30 to 40 miles per hour.

[3]On cross-examination. Dr. Anderson testified that death could occur between 2 and 72 hours of such an injury. (Tr. 677-79).

-4-

petitioner began mouth-to-mouth resuscitation. The videotape of this statement was played for the jury.

On October 31, 1997, petitioner and his wife drove to the Juvenile Office in Mountain Grove, Missouri. Jerry Conner, Chief Deputy Juvenile Officer, testified that investigators spoke first with Ms. Scott, while petitioner remained in the waiting area. (Tr. 742). Petitioner was then interviewed. He was read his Miranda rights and placed his initials and signature on a form indicating that he understood his rights and was willing to talk with investigators. (Tr. 743). In a statement that he wrote, petitioner stated that Devin had soiled his pants and petitioner cleaned him up. He and Devin then wrestled on the floor and played "Superman" -- a game that petitioner described as spinning Devin around and throwing him on the couch. The last time he threw Devin, the boy landed on the arm of the couch. Devin began crying; shortly thereafter he vomited. Petitioner wrote that Devin couldn't stand very well. As the day passed, Devin continued to be sick. As he wrote in his first statement, at some point petitioner thought Devin was choking so he administered the Heimlich maneuver before getting his brother's help. (Tr. 750-53).

Investigators returned with petitioner to the family home and asked him to complete a videotaped re-enactment of his statement. (Tr. 808). In the course of this re-enactment, petitioner said he threw Devin on the couch about five or six times. Devin asked him to do it again, so petitioner picked him up and spun around several times; Devin slipped from petitioner's grasp and landed on his stomach on wooden arm of the couch. This incident occurred less than an hour after Ms. Scott and Ms. Bonilla left the house. (Tr. 759-79).

Daniel Messey, a state investigator, testified that he told petitioner he thought he was lying. (Tr. 809). Petitioner acknowledged that he hadn't told the truth. In a

final videotape, petitioner stated that he was sitting on the couch when Devin approached him looking upset. Petitioner could smell that Devin had soiled his pants. Petitioner lost his temper and picked Devin up and spanked him. He then threw Devin toward the couch. The boy landed on the arm of the couch. Petitioner then picked him up by the collar of his shirt and sat him on the couch and shook him. He spanked him again. By then, petitioner realized he had lost his temper. He went outside to try to calm down. When he came back inside, Devin was on the floor, holding his stomach. He threw up and complained that he was in pain. Petitioner thought it was two or three hours after he threw Devin against the couch arm before he asked his brother for help. (Tr. 813-20).

Additional facts will be introduced as necessary to address the merits of petitioner's claims.

### III. Legal Standard

Federal courts may not grant habeas relief on a claim that has been decided on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d)(1)-(2).

A state court's decision is "contrary to" clearly established law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005). "The state court need not cite or even be aware of the governing Supreme

Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Brown v. Luebbers, 371 F.3d 458, 461 (8th Cir. 2004) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." Id.

A decision involves an "unreasonable application" of clearly established law if "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner," Payton, 125 S. Ct. at 1439; Williams v. Taylor, 529 U.S. 362, 405 (2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 406. "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (quoting Williams, 529 U.S. at 410-11).

IV. **Discussion**

**Claim 1: Denial of Sanctions**

In his first claim for relief, petitioner contends that the trial court erred in denying his motion to sanction the State for failing to timely disclose a statement by Denise Bonilla, Cheryl Scott's mother.

The trial court conducted a hearing pursuant to § 491.075, Mo.Rev. Stat., which sets forth the procedures by which a court determines the admissibility of a child's statement. Ms. Bonilla testified outside the presence of the jury that in September 1997 she saw bruises on Devin's back. When she asked him how he obtained the bruises, he told her that petitioner made the bruises with his fist. (Tr. 688-89). The trial court ruled that the statements had sufficient indicia of reliability but that the

State had failed to give adequate notice. See § 491.075.3 (statement may not be admitted unless prosecuting attorney notifies defense counsel in sufficient time to provide "a fair opportunity to prepare to meet the statement"). The trial court ruled that the statements were inadmissible during the State's case in chief but could be used in rebuttal. Defense counsel did not object to the Court's ruling and the statements were not admitted into evidence. In his motion for a new trial, defense counsel argued that the late disclosure of the statement affected his trial strategy in that he was precluded from calling favorable witnesses for fear of opening the door to admission of Ms. Bonilla's testimony. In addition, counsel argued, he was prevented from properly advising petitioner regarding whether to plead guilty.

On appeal, petitioner argued that the trial court should have imposed sanctions beyond barring admission of the statement in the State's case-in-chief. The claim was not preserved for appellate review and thus was analyzed under the plain error standard. The Missouri Court of Appeals concluded that petitioner failed to establish manifest injustice. The court noted that Devin's grandparents had been listed as State witnesses in the information filed in March 1998. In addition, defense counsel knew for several weeks before trial that the State intended to introduce statements Devin had made to his grandparents in April or May of 1997. Nonetheless, counsel never interviewed the grandparents. The Court of Appeals concluded that petitioner could not claim he was unfairly surprised to learn that the grandparents had damaging evidence. With respect to the State's violation of § 491.075, the Missouri Court of Appeals opined that the trial court had fashioned an appropriate remedy by excluding the evidence.

Petitioner does not claim that the State withheld exculpatory or favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). His claim is, in

essence, a challenge to the trial court's evidentiary ruling and thus is a matter solely of state law. To the extent that he asserts a claim implicating Federal law, he has failed to establish that the decisions of the state courts were contrary to or an unreasonable application of that law and thus is not entitled to relief on this claim.

### Claim 2: Denial of Request for Continuance

Counsel requested a continuance of the trial setting, arguing that (1) he was not adequately prepared; (2) he required more time to investigate the medical evidence and to hire a defense expert; (3) the state surprised the defense with new witnesses; and (4) counsel discovered that he had a conflict of interest. Petitioner contends that the trial court's denial of the motion to continue violated his rights to due process and to an adequate defense.

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (citing Avery v. Alabama, 308 U.S. 444, 446 (1940)). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id. at 589-90.

Trial was initially scheduled to begin on October 19, 1998. On October 13, 1998, defense counsel requested and received a continuance to December 1, 1998. Counsel requested another continuance on November 23rd; that motion was denied. On November 24th, defense counsel took the deposition of Dr. Anderson. On November 30th, the State identified a witness who would testify that Devin's mother expressed concern about leaving her son with petitioner. Defense counsel again

moved for a continuance; the motion was denied. On December 1st, defense counsel argued that he had a conflict of interest, based upon his long-standing relationships with two of the investigators.[4] On December 2nd, in response to questions from the court, petitioner stated that counsel needed time to speak with two witnesses and obtain an expert. At the same time, however, petitioner expressed confidence in his lawyer. There was no mention of counsel's alleged conflict of interest. The renewed requests for a continuance were denied.

The Missouri Court of Appeals affirmed the trial court's decision to deny a further continuance. With respect to counsel's claim that he was unprepared, the trial court noted that counsel seemed to have good command of the case and the appellate court concluded that seven months was an adequate amount of time for trial preparation.

With respect to counsel's argument that it was necessary to obtain an expert witness regarding cause of death, the Court of Appeals noted that counsel knew that proof of the cause of death was critical to the State's case and thus counsel could not have been surprised by the need to rebut the pathologist's testimony. More significantly, the court concluded that petitioner was not prejudiced by the lack of an expert: Dr. Anderson testified on direct examination that it was possible for a child to die by 4:30 or 5:00 in the evening if the injuries had been sustained between 8:00 and 11:00 in the morning. On cross-examination, however, defense counsel elicited testimony from Dr. Anderson that death in less than twelve hours would be highly unlikely. The Court of Appeals concluded that, in the absence of assurance that a defense expert would have provided more favorable testimony, petitioner was unable to show that he was prejudiced by the decision to deny a continuance.

---

[4]In arguing his motion for a continuance, counsel repeatedly stated that he had entered the representation for the limited purpose of negotiating a plea deal and had never intended to take the case to trial.

Petitioner contends he required a continuance to respond to the late disclosure of witness Pauline Schultz, who had heard Cheryl Scott express concern about leaving her son in petitioner's care. The State represented that Ms. Schultz would be called only as a rebuttal witness in the event that Cheryl testified. Defense counsel argued that he had intended to rely on Cheryl as a significant witness and needed additional time to decide whether to do so, in light of the State's rebuttal witness. Cheryl did not testify at trial. The Missouri Court of Appeals noted that the State had no obligation to disclose Ms. Schultz as a rebuttal witness and the State's "gratuitous effort" to notify petitioner was not grounds for a continuance. Petitioner has not established that this decision is contrary to or an unreasonable application of existing Federal law. He is not entitled to relief on this basis.

Petitioner's claim that he required a continuance to respond to counsel's conflict of interest will be addressed in the next section.

### Claims 2, 3, and 8: Counsel's Conflict of Interest

Petitioner asserts three claims arising from counsel's alleged conflict of interest: the trial court erred in denying counsel's motion for a continuance to obtain conflict-free counsel (asserted in Claim 2); the trial court erred in denying counsel's motion to withdraw (Claim 3); and counsel was ineffective by failing to withdraw as soon as he realized he had a conflict of interest (Claim 8).

On December 1, 1998, the first day of trial, defense counsel informed the trial court that he had a conflict of interest arising from his long-term friendships with Juvenile Officer Jerry Connor and Sheriff Garrett Mitchell. The prosecutor indicated that Sheriff Garrett would not be called to testify. With respect to Mr. Connor, defense counsel explained during an *in camera* proceeding that he had spoken with Mr. Connor during the early days of the investigation and he "thought Mr. Connor told [him] that

they had had a problem that Mr. Scott had wanted an attorney." The night before trial, counsel said, Mr. Connor told him that he intended to testify that petitioner had never asked for an attorney. Counsel argued to the trial court that, based on his recollection of the earlier conversation, he was a potential witness to rebut Mr. Connor's testimony. On the following day, petitioner told the trial court that he had no difficulties communicating with his lawyer, who was doing everything he asked him to do. Petitioner stated that he had complete confidence in his lawyer and wanted his services; counsel stated that he was willing and able to represent petitioner, but reiterated that he believed he was not prepared. The alleged conflict of interest was not raised during this hearing or during argument on petitioner's motion to suppress.

The right to effective assistance of counsel under the Sixth Amendment is impaired where counsel labors under a conflict of interest. Strickland v. Washington, 466 U.S. 668, 692 (1984). In limited circumstances such as where a defendant can show that "an actual conflict of interest adversely affected his lawyer's performance," courts will presume prejudice rather than require an affirmative showing by the defendant. Winfield v. Roper, 460 F.3d 1026, 1039 (8th Cir. 2006), (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). The Cuyler rule applies only where defense counsel was "actively representing" conflicting interests. Id. The alleged conflict in this case arose from counsel's longstanding friendships with prosecution witnesses and thus the Cuyler rule does not apply. Petitioner fares no better under Strickland in that he cannot establish that a lawyer without the alleged conflict of interest would have elicited different testimony from the State's witnesses. Because the Court does not believe that conflict-free counsel would have altered the evidence, petitioner cannot establish that he was impaired by the trial court's refusal to grant a continuance to obtain other counsel. Finally, the Missouri Court of Appeals determined that counsel

never requested leave to withdraw. For all of the above reasons, petitioner has failed to establish that he is entitled to relief on any claim arising from counsel's alleged conflict of interest.

### Claim 4: Motion for Mistrial

During *voir dire*, defense counsel notified the trial court that Devin's family members wore buttons with Devin's photograph into the courtroom and the lunchroom. Counsel asked for a mistrial. The court denied the motion at that stage but agreed to hear evidence regarding the issue. The next day, petitioner reported to the court that members of the jury panel were at a restaurant at the same time as family members displaying photographs. He had no knowledge whether any of the selected jurors had seen the buttons. The trial court offered to inquire of the panel members but pointed out that asking the jurors whether they saw the buttons might "make the people sitting in the courtroom stand out to them." Petitioner requested, and received, time to discuss the issue with his lawyer; he did not renew his request to question the jurors. The trial court ruled that witnesses were not allowed to wear buttons and that there should be "no obvious attempts to display" the buttons to the jurors.

On review, the Missouri Court of Appeals determined that petitioner had not established that he suffered any prejudice arising from the jurors' exposure to the buttons. First, there was no evidence that the jurors saw the buttons; second, the record does not describe the images and there is no basis to conclude that they were inflammatory; and finally, sixteen photographs, including autopsy pictures, were shown to the jury. These photographs, the Court of Appeals noted, were likely to be more inflammatory than buttons worn by family members. Petitioner has not established that this decision is contrary to or an unreasonable application of existing

Federal law. **Claims 5 and 6: Petitioner's Statements and Sufficiency of the Evidence**

Petitioner asserts that he requested a lawyer during questioning on October 31, 1997. He claims that his request was not honored, rendering his subsequent statements inadmissible. He further claims that, with the statements excluded, the remaining evidence was insufficient to sustain his conviction.

On October 31, 1997, petitioner and his wife drove to the Juvenile Office, arriving at about 1:00 in the afternoon. Ms. Scott was interviewed first; petitioner testified at the suppression hearing that he heard his wife crying and screaming. He asked to use a phone, but was told that he would have to sign a waiver first. He signed a Miranda Warning form at 2:22 p.m. and again asked to use the phone to call his mother so she could obtain a lawyer for him. He was told it was "too late" in the day to reach a lawyer. He was also told that he had waived his right to an attorney by signing the Miranda Warning form.

Following an interview, petitioner wrote the statement in which he said he accidently threw Devin onto the arm of the couch while playing Superman. He agreed to accompany the officers to his home where he completed a video re-enactment. He then returned to the sheriff's office, where he agreed to complete a "voice stress test." After the test, the officers told him they thought he was lying. Petitioner testified at the suppression hearing that, in the course of the following discussion, one of the investigators threatened him with the death penalty. Petitioner then made another videotaped statement in which he stated that he was angry with Devin for soiling his pants and had thrown him toward the couch. On the videotape, petitioner acknowledged that he had been advised of his rights, he understood his rights, and his statement was voluntary. Petitioner told the trial court that he asked for a lawyer at

a number of different times. The investigators testified that petitioner did not ask for a lawyer at any time. The trial court denied petitioner's motion to suppress his statements.

Once an accused expresses a desire to deal with the police only through counsel, the police may not further interrogate the accused until counsel has been made available, unless the accused initiates further communication. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). In this case, however, there was conflicting testimony regarding whether petitioner asked for counsel. The trial court clearly credited the testimony of the law enforcement personnel, and the Missouri Court of Appeals gave deference to the trial court's credibility determinations. A state court's determination of a factual issue is entitled to a presumption of correctness which the petitioner has the burden of rebutting by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "The deference owed to the state trial court pursuant to § 2254(e)(1) includes deference to its credibility determinations. A federal court can only grant habeas relief if the state court's credibility determinations were objectively unreasonable based on the record." Smulls v. Roper, 535 F.3d 853, 864 (8th Cir. 2008). There is no basis for overturning the trial court's credibility determination. Because petitioner cannot establish that the trial court erred in admitting his statements, his claim that the remaining evidence was insufficient to support his conviction is moot.

### Claim 7: Variance Between Charged Offense and Jury Instruction

Petitioner claims that the second-degree felony murder instruction improperly varied from the indictment such that he was convicted of an uncharged offense.

On March 31, 1998, petitioner was charged with murder in the second degree. The information alleged that petitioner "with the purpose of causing serious physical injury to [Devin] caused the death of [Devin] by throwing the victim into a couch arm."

An amended information filed on September 18, 1998, charged petitioner with conventional murder in the second degree and, in the alternative, felony murder in the second degree. On October 14, 1998, petitioner was charged by indictment of conventional murder in the second degree and, in the alternative, felony murder in the second degree. Count I alleged that petitioner caused Devin's death "by throwing the victim into a couch arm." Count II alleged that Devin "was killed by a blow to his abdominal area and as a result of the perpetration of the class D felony of endangering the welfare of a child." The verdict director for the charge of felony murder in the second degree stated:

> If you do not find the defendant guilty of murder in the second degree as submitted in Instruction No. 8, you must consider whether he is guilty of murder in the second degree under this instruction.
>
> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that . . . the defendant committed endangering the welfare of a child first degree as submitted in Instruction No. 11, and
>
> Second, that defendant caused the death of Devin Jose Bonilla after throwing him through the air causing him to strike a hard object, and
>
> Third, that Devin Jose Bonilla was killed as a result of the perpetration of that endangering the welfare of a child first degree,
>
> then you will find the defendant guilty of murder in the second degree.

The jury found petitioner guilty of felony murder under this instruction. Petitioner contends that this instruction varied from the indictment to such an extent that he was convicted of an uncharged offense.

"As a general rule, an indictment is sufficient if it first, contains the elements of the charged offense and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead double jeopardy as a bar to future prosecution." United States v. Davis, 103 F.3d 660, 675 (8th Cir. 1996) (quoting

United States v. Just, 74 F.3d 902, 903-04 (8th Cir. 1996). It has long been the rule that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215-16 (1960). To convict a defendant on a charge not made against him in the indictment is fatal error that requires reversal. Id. at 219. Jury instructions are usually found to have caused a constructive amendment only if they "in effect allowed the jury to convict the defendant of an offense different from or in addition to the offenses alleged in the indictment." United States v. Emery, 186 F.3d 921, 927 (8th Cir. 1999) (quoting United States v. Begnaud, 783 F.2d 144, 147 (8th Cir. 1986)).

The uncontested evidence was that petitioner threw Devin and caused him to strike the couch arm. Petitioner contends that the verdict director varies "fatally" from the indictment in that the two means of causing Devin's injury – "causing a blow to his abdominal area" (as charged in the indictment) and "throwing him through the air causing him to strike a hard object" (as set forth in the verdict director) -- are so distinct as to prevent him from preparing an adequate defense. The Missouri Court of Appeals considered and rejected this argument, determining that the blow to the abdomen occurred when petitioner threw Devin and caused him to land on a hard object. The Court of Appeals found that petitioner had conceded as much when, in closing argument, defense counsel stated that the jury had to find that Devin's death resulted from "a blow of some sort to the abdomen." Petitioner was charged with and convicted of felony murder in the second degree, the underlying felony being endangering the welfare of a child. The jury instruction in this case did not result in petitioner being convicted of an offense different from the offense charged in the indictment. The claim will be denied.

### Claim 9: Counsel Failed to Object to Improper Voir Dire Questions

Petitioner contends the prosecutor asked a series of questions during *voir dire* that were designed to seek a commitment from the panel to a particular course of action. Petitioner claims that counsel should have objected to the following questions:

> Q: Now, we're going to talk about something, and every parent disciplines their children differently, right? Okay. And that's fair and this isn't, this case isn't about how you would discipline a child and how you shouldn't so if you hear ideas that's floating around in the back of your mind, it's not, so does anybody here think it's ever appropriate to throw a child as a form of discipline?
>
> Q: Okay. So does anybody ever think it's okay to cause bruises or abrasions or cuts to a child?
>
> Q: All right. Is it ever okay to throw a child into a hard object out of anger?
>
> Q: All right. Now, does anybody think it is okay as part of like a potty training situation to get so mad at a kid it's okay if you throw them into a hard object or kicking them with your foot or punching them in the stomach?
>
> Q: [I]t's understandable that a parent could get frustrated and angry, especially at potty training age, right? That's normal. Now, those natural feelings that parents . . . have, at kids, you get angry at the little ones, you know, trying to push your buttons sometimes, those feelings are normal and natural and those of us who have them might be inclined to feel sympathetic with other parents in that situation, you could identify why somebody might get angry with a child, right?
>
> Anybody feel that their emotions or sympathy or any sort of common understanding for a parent in a similar situation might make them so sympathetic to a person that they might excuse an action out of anger?
>
> Let me ask that more clearly. Anybody ever think that anger, that emotion you might have at a child is ever an excuse to throw that child or kick or punch that child?

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby. Strickland v. Washington, 466 U.S. 668, 687 (1984). With respect to the first Strickland prong, there exists a strong presumption that counsel's conduct falls within the wide range of professionally

reasonable assistance. Id. at 689. In order to establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In order to obtain relief under § 2254(d)(1), however, it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, petitioner must show that the Missouri courts applied Strickland to the facts of his case in an objectively unreasonable manner. Id.

In this instance, the post-conviction motion court rejected petitioner's ineffective-assistance claim after determining that counsel's failure to object was a matter of trial strategy. The Missouri Court of Appeals determined that the *voir dire* questions were not improper. Trial counsel was not ineffective, the court found, because counsel cannot be held derelict for failing to make nonmeritorious objections. Petitioner has failed to show that the Missouri courts applied Strickland in an objectively unreasonable manner.

### Claim 10: Counsel's Failure to Timely Object to Incomplete Redaction

Petitioner's final videotaped statement occurred after he failed a voice stress analysis test. References to the test were redacted from the tape before it was played for the jury; the trial court overruled as untimely counsel's objection to the admission of petitioner's statement (in response to a redacted question) that he had lied to investigators. (Tr. 813-20). The Missouri Court of Appeals found no reasonable probability that redaction of the statement would have altered the outcome of the trial. Petitioner has not established that this decision is contrary to or an unreasonable application of existing Federal law.

## V. Conclusion

In summary, petitioner has failed to establish that the state courts' decisions on his claims were contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in State court proceedings. 28 U.S.C. § 2254(d). Because the petitioner has failed to make a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability. See Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997).

A separate Order in accordance with this Memorandum will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2010.